1
2
3
4
5
6
7
8                           IN THE UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10   TERRY D. BUFORD,

11                 Petitioner,                    No. CIV S-08-2986 JAM CHS

12         vs.

13   JAMES A. YATES, Warden,

14                 Respondent.          FINDINGS AND RECOMMENDATIONS

15   _____/

16                                  I.  INTRODUCTION

17         Petitioner Terry Buford is a state prisoner proceeding pro se with a petition for a

18   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner stands convicted of attempted

19   premeditated murder of a fetus, assault with a deadly weapon, second degree robbery, kidnapping

20   to commit robbery, attempted robbery, and conspiracy to murder a human fetus, for which he is

21   currently serving multiple life sentences.  In the pending petition, petitioner claims that various

22   errors at trial and sentencing deprived him of his constitutional rights.

23                                  II.  BACKGROUND

24         On December 14, 2005, the Sacramento County District Attorney's Office

25   charged petitioner and three co-defendants (Dwayne Curry, Titenesha Russell, and Tashara

26   Boone) with six crimes:

                                          1

(1)     Count 1 – attempted premeditated murder of "Baby Doe," a seven-month-old fetus (Cal. Penal Code §§ 664, 187(a));

(2)     Count 2 – assault with a deadly weapon upon L.R. (Cal. Penal Code §245(a)(1));

(3)     Count 3 – second-degree robbery of L.R. (Cal. Penal Code §211);

(4)     Count 4 – kidnapping to commit robbery (also known as "aggravated kidnapping," Cal. Penal Code §209(b)(1));

(5)     Count 5 – attempted robbery of L.R. (Cal. Penal Code §§ 664, 211); and

(6)     Count 6 – conspiracy to murder a human fetus (Cal. Penal Code §§ 182(a)(1), 187(a)).

(Clerk's Transcript on Appeal ("CT") at 207-11.)

At the joint trial of petitioner and his co-defendants, evidence was admitted as follows:

The Prosecution's Case

L.R. dated Buford before she became pregnant with his child in February 2004.  As the pregnancy progressed, Buford told L.R. she should have an abortion.  L.R. wanted to have the baby and told Buford that he could "just pay child support" if he "didn't want to be there."  Buford acted indifferently and began to deny that the child was his.  When L.R. was about five months pregnant, L.R. and Buford broke off their relationship.

At some time in the weeks leading up to the assault, L.R. called Buford's cell phone.  A woman answered and identified herself as Buford's sister.  The same woman, whose voice L.R. identified as Russell's, called L.R. to ask about the baby and the identity of the father.  She continued to make harassing phone calls to L.R., calling her a "bitch" and threatening to kill L.R. and her baby.

Before the assault, L.R. told petitioner that she had $700 and was willing to lend him money to repair his car.  She lived with her grandmother and kept the money there.

Boone testified pursuant to her agreement to cooperate with the district attorney's office.  She and petitioner were "best friends."  On September 20, 2004, five days before the assault and kidnapping, Buford asked Boone to "beat somebody up."  She agreed to help him.  In subsequent conversations, Boone learned that Buford and L.R. had argued over whether he was the baby's

2

father.

Between September 20 and September 25, Buford and Boone devised a plan.  Buford would invite L.R. to the movies but take her to a park where Boone would beat her up.  The goal was to force L.R. to have a miscarriage.  Boone asked Russell to help beat up L.R. and she agreed.

About 8:00 p.m. on September 25, 2004, Buford picked up L.R. at her home for the ostensible purpose of taking her to the movies.  He was driving a white Chevrolet Malibu.  Curry, whom L.R. knew through Buford as "Pacman," was sitting in the backseat.  Buford picked up Russell, who joined Curry in the backseat, then drove to a liquor store.  After Buford, Curry and Russell bought liquor, everyone changed seats.  Russell drove with Curry beside her.  Buford and L.R. were in the backseat.  Instead of going to the movies, defendants drove L.R. to a park in Elk Grove.

Buford and Russell informed Boone of their whereabouts by cell phone, while she waited for their arrival at the park.  Buford, Curry and Russell drank behind some bushes and L.R. sat by herself.  Eventually, L.R. told Buford she wanted to go home and he agreed to drive her back.  Buford had his arm around L.R.'s waist, but turned sideways as they walked.

When Buford gave the signal, Boone and Russell ran in front of him and L.R., turned, and Boone sprayed L.R. in the face with Mace.  Boone also hit L.R. in the face.  L.R. tried to fight back but was blinded by the Mace.  Russell joined the fray and punched L.R. in the face.  L.R. fell to the ground.  L.R. told her attackers that she was pregnant.  When L.R. asked Buford for help, he responded, "[J]ust fight back."

The attack continued while L.R. was on the ground.  Curry kicked her in the side.  He also threw a garbage can at L.R., hitting her in the head.  Boone removed L.R.'s tennis shoes and someone took her cell phone.  At that point, Boone and Russell left in the Malibu by themselves.  They drove north on Interstate 5 toward Meadowview where Russell's grandmother lived.

Back at the park, L.R. asked Buford to call an ambulance and he said, "Okay."  However, instead of calling the ambulance, Buford called Boone and told her to "come back and finish the job."  Boone asked Buford if he was trying to kill L.R., and Buford said, "[N]o, just the baby."  He wanted Boone to continue, "as long as that baby gets up out of her."  While Russell and Boone were driving back to the park, Buford called again to tell them to bring a baseball bat and flashlight from the car.

Boone and Russell approached L.R. at the park carrying a flashlight and baseball bat.  Boone struck L.R.'s leg with the bat

3

and Russell hit her in the head with the flashlight.  The women told L.R. that Buford was not the father of her baby and he was not going to pay child support.  L.R. named someone else as the baby's father because she wanted the beating to stop.

Boone testified that while Russell and L.R. continued to fight, Curry hit L.R. in the head, knocking her to the ground.  Boone also stated that Curry kicked L.R. with both feet as she lay on the ground saying, "Help me, my baby."  L.R. lost consciousness while she was on the ground.

Boone and Curry began searching L.R.'s clothing for money.  Boone took $20 that they found inside L.R.'s bra.  Changing her earlier testimony that she first learned of L.R.'s $700 in the car after they all left the park, Boone stated on redirect examination that Buford and Curry were looking for the $700 when Curry pulled L.R.'s clothes off.  Curry removed L.R.'s pants and someone removed her socks.  Defendants carried L.R. to the Malibu.

Once inside the car, Buford showed Boone and Russell a picture of the $700 on his cell phone, an image he had received from L.R.  Although L.R. was not fully conscious, Buford suggested that they get the money from L.R's house by having her call her brother and asking him to bring it to the car.

Curry drove to Russell's apartment to get clean pants and underwear for L.R. Russell's roommate brought the clothes to the car and Boone and Russell put them on L.R. in the backseat of the car.  Russell put a BB gun on her lap to scare L.R.

Curry continued to drive.  Russell, Boone and Curry bought and smoked marijuana with the $20 they had taken from L.R.  When someone looked in the car, Russell stated, "See what we do?  See how we beat up bitches?"  They let L.R. out of the car to urinate near a tree, but Boone and Russell stood next to her.

Once L.R. was awake, defendants turned their attention to the money.  Boone and Russell told L.R. that she "better find some way" to retrieve the $700.  Someone handed L.R. a cell phone and ordered her to call home.  L.R. telephoned her grandmother and told her to send L.R.'s brother outside with her purse.

L.R.'s grandmother stepped outside of the house at 1:00 a.m. and saw the Malibu approaching.  Curry sped away and L.R. called her grandmother again, telling her to send L.R.'s brother to the car with the money.  Sensing trouble, L.R.'s grandmother asked if she was being held against her will.  L.R. said that she was.

Curry pulled up again and L.R.'s brother approached the car.  When he saw that L.R.'s face was bruised and bleeding, he told the

4

occupants of the car to let her out.  Instead, Curry drove off with L.R.'s brother holding onto the car door.  L.R.'s grandmother called 911 when L.R.'s brother came inside.

L.R. asked to be taken to a hospital, but Curry refused.  After discussing alternatives, defendants left L.R. by the side of the road.  Curry drove to Russell's apartment where he, Russell and Boone spent the night.

L.R. walked to a nearby apartment where a resident found her and called 911.  L.R. had bruises on her face and stomach and was fading in and out of consciousness.  An ambulance transported her to the hospital.

Doctors treated L.R. for a fractured eye socket and extensive bleeding inside the eye.  She was still experiencing double vision at the time of trial.  The doctors drained blood from both of L.R.'s swollen ears.  They noticed abrasions on L.R.'s face, abdomen and buttocks, and bruises all over her body.

Fetal heart monitors indicated that L.R.'s unborn baby was in distress and not receiving enough oxygen.  L.R. was nearly 32 weeks pregnant at the time of the assault and had not experienced any problems with her pregnancy.  Doctors delivered the baby by emergency Cesarean section.  The baby had an initial Apgar score of 1 on a scale of 1 to 10.  A normal baby has an initial Apgar score of 7 or 8.  Doctors placed the baby on a mechanical ventilator for 48 hours and supplied oxygen through its nasal passages for another five days. The baby remained in the hospital for three weeks.

Buford's Defense

Buford's aunt, Crystal Latimore, testified that she met Boone in county jail in the fall of 2005.  Boone approached her and began talking about the case.  According to Latimore, Buford picked up Boone on his way to the movies because she asked for a ride.  The aunt also testified that Boone said that the fight with L.R. was just between the two of them.

Curry's Defense

Curry testified that he called Buford on the day of the assault to ask him for a ride to a motel where he was scheduled to babysit.  When Buford arrived, he told Curry that he had to "handle some business" before driving him to the motel.  Buford picked up L.R. in Del Paso Heights, picked up Russell in another part of town, then drove to Elk Grove.

According to Curry's testimony he did not learn about the plan to beat up L.R. until they met Boone at the park.  Curry watched

Boone and Russell assault L.R., but did not take part. He also claimed that he did not know that L.R. was pregnant until she fell to the ground and her peacoat came open.

Curry also testified about what happened when Boone and Russell returned to the park. He confirmed earlier testimony that Boone hit L.R. with the baseball bat and Russell hit her with the flashlight. Curry denied that he kicked or hit L.R., or threw a garbage can at her. [Boone]'s sister[1] testified later at trial that Buford, rather than Curry, had kicked L.R. in the stomach while she lay on the ground in the park.

With respect to L.R.'s $700, Curry recounted that Russell pointed a gun at L.R. in the car and threatened to shoot her if she did not get the money. Curry said that he did not know what Russell was talking about and had not been privy to any discussions regarding the $700. He denied seeing the cell phone photo of the money. However, on cross-examination, Curry stated that while L.R. was lying on the ground in the park after the beating, he heard Buford tell the group to "check her for money."

Curry testified that he drove the car to Russell's apartment and L.R.'s grandmother's at the direction of Boone and Russell because he was afraid of them. He thought Russell's gun was real.

In response to a question from Russell's trial counsel, Curry testified that he was drunk at the park after consuming one and a half bottles of Mad Dog. On cross-examination, Curry stated that he knew what was happening and was able to drive the car. He acknowledged that he told the district attorney's investigator that he was "a little screwed up" from the alcohol, but "not too bad."

Russell's Defense

Russell testified that she spoke to L.R. one time before the assault. She was on the speakerphone during a conversation between Boone and L.R. Boone and L.R. were arguing over Buford and L.R. challenged Boone to a fight.

On the night of the assault, Russell drove the Malibu with Buford, Curry and L.R. in the car. She stopped at a liquor store and bought three bottles of Mad Dog 20/20. Buford bought a Sprite. Russell and Boone shared one bottle; Curry drank the second bottle; and all three of them shared the third bottle. Russell testified that she took ecstasy that night. She also felt "out of character" because she

---

[1]  The state court of appeal's opinion from which this factual summary is taken indicates that petitioner's sister testified that petitioner, rather than Curry, kicked L.R., but review of the record reveals it was Boone's sister who gave that testimony, somewhat equivocally. (RT at 918-923 (testimony of Kimberly Harris)).

1      does not drink.

2      Russell testified that she did not know that Boone was going to
       fight L.R. until they arrived at the park and Boone said, "I'm gonna
3      fuck this bitch up."  Russell offered to assist if she needed help.
       She admitted socking L.R. in the face after L.R. bumped into her in
4      what she described as a "cat fight."  Like Curry, Russell claimed
       that she did not realize L.R. was pregnant until L.R. fell to the
5      ground.  She testified that L.R. wore a peacoat that concealed her
       stomach.
6
       Russell recounted that Buford had called Boone after they left the
7      park the first time and told them to return to "finish the job."
       According to Russell, it was the first time she realized that Buford
8      wanted to force L.R. to have a miscarriage.  Russell testified that at
       that point, she still felt the effects of the alcohol and ecstasy, but
9      "[n]ot... to the point where [she] didn't know what [she] was
       doing."
10
       Russell testified that she retrieved the baseball bat and flashlight
11     from the backseat of the Malibu, but denied hitting L.R. with the
       flashlight.  Russell and Boone put L.R. in the backseat of the
12     Malibu while she was unconscious.

13     After everyone was in the car, Buford said L.R. had money and
       showed them the photo on his cell phone.  Russell told L.R. that
14     she wanted the money and L.R. agreed to get it.  Russell assumed
       [L.R.] agreed because she did not want to suffer another beating.
15     Russell acknowledged that there was a BB gun in the car, but
       claimed she never threatened L.R. with it.  Russell stated that the
16     sole purpose of placing L.R. in the car was to take her home and
       that she never intended to force L.R. to stay in the car to rob her.
17     According to Russell, no one told Curry where to take L.R. after
       they drove away from L.R.'s house the second time.  Later that
18     night, Curry bragged that he rendered L.R. unconscious and
       complained that he got her blood on his shoes.
19

20   *People v. Curry*, 158 Cal.App.4th 766, 772-788 (2007).

21          Following jury trial, petitioner was convicted on all counts.  He was sentenced to

22   life in prison for the aggravated kidnaping, 25 years to life for the conspiracy to murder a fetus,

23   and the upper term of five years for second degree robbery.  The court also imposed an additional

24   life sentence for the attempted premeditated murder of a fetus, the upper term of four years for

25   the assault, and eight months for the attempted robbery; these sentences were stayed pursuant to

26   California Penal Code §654.  Restitution fines totaling $11,430.00 were imposed.

7

On direct appeal, the California Court of Appeal, Second District, issued a published opinion affirming the trial court's judgment and sentence. *People v. Curry*, 158 Cal.App.4th 766 (2007). The California Supreme Court denied review and also denied petitioner's subsequent application for writ of habeas corpus.

### III.  CLAIMS FOR REVIEW

Petitioner claims that he suffered various errors during trial and at sentencing. Specifically, he contends: (A) the evidence adduced at trial was insufficient to prove the elements of the kidnaping for robbery count (also referred to as "aggravated kidnaping"); (B) the trial court made an instructional error with respect to the law on aggravated kidnaping; (C) the trial court further erred by omitting various instructions on voluntary manslaughter; (D) the trial court erroneously failed to give a unanimity instruction with regard to the robbery count; (E) the trial court failed to instruct the jury that, in order to find him guilty of attempted murder under the natural and probable consequences doctrine as an aider and abettor, the jury must find that he personally premeditated the murder; (F) the trial court erred in imposing the upper term for the robbery count based on aggravating factors not found by the jury; (G) petitioner states that he "joins" in any claims presented on habeas corpus by his co-defendants; (H) petitioner's trial counsel rendered ineffective assistance; and (I) the trial court erred in imposing a restitution fine without regard for his ability or inability to pay.

### IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)). Additionally, this petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999).

Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001). This court looks to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), *cert. dismissed*, 538 U.S. 919 (2003).

## V. DISCUSSION

### A. Sufficiency of the Evidence (Aggravated Kidnapping)

Petitioner claims that the evidence adduced at trial was insufficient to show the required elements of kidnapping for robbery, also known as "aggravated kidnapping," under California Penal Code §209(b). According to petitioner, the evidence failed to show these required elements: (1) that he formed the intent to rob L.R. before she was transported from the park; (2) that L.R. was transported beyond the distance necessary to commit the robbery; and (3) that the transportation substantially increased the risk of harm to L.R. beyond that necessarily present in the commission of the robbery.

On habeas corpus review, sufficient evidence supports a conviction so long as, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *Sarausad v. Porter*, 479 F.3d 671, 677 (9th Cir. 2007), reversed on other grounds by *Waddington v. Sarausad*, 129 S. Ct. 823 (2009). As stated by the

9

1   United States Court of Appeals for the First Circuit, the focus under Jackson is not the

2   correctness, but rather, the reasonableness of the state judgement.  *See Hurtado v. Tucker*, 245

3   F.3d 7, 19 (1st Cir. 2001).  The dispositive question is "whether the record evidence could

4   reasonably support a finding of guilt beyond a reasonable doubt."  *Chein v. Shumsky,* 373 F.3d

5   978, 982 (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at 318).

6          Under this standard, "*all of the evidence* is to be considered in the light most

7   favorable to the prosecution."  *Wright v. West*, 505 U.S. 277, 296 (1992) (quoting *Jackson*, 443

8   U.S. at 319) (emphasis in original).  The prosecution need not affirmatively rule out every

9   hypothesis except that of guilt.  *Wright*, 505 U.S. at 296.  A reviewing court such as this one

10  must presume,  even if it does not affirmatively appear in the record, that the trier of fact resolved

11  any such conflicts in favor of the prosecution, and must defer to that resolution.  *Id.*

12          On direct appeal of petitioner's convictions, the state appellate court applied the

13  rule of *Jackson* to reject petitioner's argument that insufficient evidence supported his conviction

14  for aggravated kidnapping.  Petitioner's claim is therefore evaluated under 28 U.S.C.

15  §2254(d)(1).  *See Sarausad*, 479 F.3d at 677-68 ("Section 2254(d)(1) plainly applies to *Jackson*

16  cases...[¶] By contrast, §2254(d)(2) is not readily applicable to *Jackson* cases."), (*overruled on*

17  *other grounds* in *Waddington v. Sarausad*, 129 S.Ct 823 (2009)).  Thus, the issue  for review is

18  not whether "the state court unreasonably determined disputed facts," but rather, "whether the

19  state court unreasonably applied the *Jackson* test."  *Id.* at 678.

20          With regard to the evidence of when petitioner formed the intent to rob, the state

21  appellate court held:

22          Defendants argue that there is insufficient evidence to prove them
            guilty of aggravated kidnapping in count four.  They maintain there
23          is no evidence to show that they acted with the specific intent to
            rob L.R. at the time they moved her from the park to the car.  The
24          record does not support defendants' argument.

25          When a defendant challenges the sufficiency of the evidence, the
            reviewing court "must determine 'whether, after viewing the
26          evidence in the light most favorable to the prosecution, any rational

10

trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (Jackson v. Virginia (1979) 443 U.S. 307, 319 [61 L. Ed. 2d 560, 573, 99 S. Ct. 2781], italics in original.)  '[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence – that is, evidence which is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'  (People v. Johnson (1980) 26 Cal.3d 557, 578 [162 Cal. Rptr. 431, 606 P.2d 738].)"  (People v. Davis (1995) 10 Cal.4th 463, 509 [41 Cal. Rptr. 2d 826, 896 P.2d 119] (Davis).)  "Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. [Citation.]"  (In re Michael D. (2002) 100 Cal.App.4th 115, 126 [121 Cal. Rptr. 2d 909].)  Indeed, we """presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.""'[Citation.]"  (Davis, supra, at p. 509.)

A person is guilty of kidnapping under California law if he or she "forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county..."  (§ 207, subd. (a).)  The Legislature dictates greater punishment for aggravated kidnapping under section 209, subdivision (b)(1) where the accused "kidnaps or carries away any individual to commit robbery..."  Section 209 also requires asportation or "movement of the victim that is not merely incidental to the commission of the robbery, and which substantially increases the risk of harm over and above that necessarily present in the crime of robbery itself. [Citations.]"  (People v. Rayford (1994) 9 Cal.4th 1, 12 [36 Cal. Rptr. 2d 317, 884 P.2d 1369] (Rayford); see § 209, subd. (b)(2).)

The parties agree that for them to be found guilty of aggravated kidnapping, the evidence must show that they intended to commit the robbery at the time they held or detained L.R.  "A person [cannot] kidnap and carry away his victim to commit robbery if the intent to rob [is] not formed until after the kidnap[p]ing ha[s] occurred."  (People v. Tribble (1971) 4 Cal.3d 826, 831 [94 Cal. Rptr. 613, 484 P.2d 589].)  Thus, the crime of aggravated kidnapping "'is similar to burglary where it is necessary to show that the entry was with the intent to commit larceny or any felony. An illegal entry but without such an intent is not a burglary [citation]; similarly..., kidnapping without intent to rob constitutes kidnapping but not kidnapping for purpose of robbery; and a robbery during a kidnapping where the intent was formed after the asportation is a robbery and not a kidnapping for purpose of robbery.'[Citations.]"  (Ibid.)  Moreover, the robbery need not be completed.  "All that is required is that the defendant have the specific intent to commit a robbery at the time the kidnapping begins."  (People v. Davis (2005) 36 Cal.4th 510, 565–566 [31 Cal.

Rptr. 3d 96, 115 P.3d 417].)

Defendants claim they did not have the specific intent to rob L.R. at the time they put her in the Malibu. They cite evidence to show that they decided to rob L.R. only after they drove away with L.R. and Buford showed them the photo of the $700 on his cell phone. All three maintain that there is no evidence they knew about the money before they placed L.R. in the car. Defendants ignore the inferences to be drawn from other evidence presented at trial.

Boone testified on redirect examination that Buford and Curry were looking for the $700 when Curry pulled L.R.'s clothes off at the park. Both Russell and Curry told the district attorney's investigator that they heard Buford tell the others to "check for money" while L.R. lay on the ground after the second assault. Buford told them that L.R. "had money someplace, she had just gotten paid or something." Russell also told the district attorney's investigator that she heard Buford ask L.R. where the money was several times. According to Russell's statement to the district attorney's investigator, thereafter, Curry ripped off L.R.'s clothes and found the $20. And in the car Buford said to L.R., "I thought you had $700." We conclude that the jurors could reasonably infer from this circumstantial evidence that defendants knew about L.R.'s $700 before they put her in the car and formed the required specific intent to rob her at that time. (In re Michael D., supra, 100 Cal.App.4th at p. 126.)

Buford contends that "any inference that [he] intended to rob [L.R.] of the money at the time of the movement is made unreasonable by [L.R's] own testimony that it was her intent to lend Buford the $700, that she had informed him of that fact and that she had never verbally reneged." She did, in fact, testify on that point at trial. However, we reject Buford's contention. The evidence was that Buford lured L.R. to the park where he set her up so she could be ambushed and brutally assaulted by his friends. And, although L.R. testified that she had previously offered to loan Buford the $700 to repair his car, a jury could reasonably infer that, under the circumstances, L.R. was no longer willing to loan him money.

*Curry*, 158 Cal.App.4th at 778-80.

Petitioner argues that the state appellate court misconstrued the evidence in order to find sufficient evidence that he intended to rob L.R. of the $700 when she was placed in the Malibu. According to petitioner, the state court misconstrued Boone's testimony by finding that Boone testified "Buford and Curry were looking for the $700 when Curry pulled L.R.'s clothes off at the park." Specifically, petitioner argues in the pending federal petition:

1

2

The Court's statement is based on an exchange between Boone and the district attorney[:]

3

> Q:  And when you got the – I want to ask you a couple of other things about the statement in December.  At the time that [L.R.]'s clothes were being taken off, do you recall that – that part of the – after she had been assaulted the first and second time and her clothes are being taken off, okay, you told Investigator Williams that Curry and Buford were looking for the $700 as Curry pulled off her clothes, right?

4

5

6

7

> A:  Yes.

8

9

> As this exchange makes clear, all Boone says is that she told the investigator that Curry and Buford were looking for money at the time.  She does not testify to the veracity of the statement she made to the investigator.  Nor does she say when she formulated that opinion.  It is mere speculation to conclude that petitioner was looking for $700 at that time, particularly in light of the fact that he could have asked L.R. to bring the money that night, had robbery been his intent.

10

11

12

13

(Petition at pp. 7-8, n.3.)

14

Boone's testimony with regard to the $700 was indeed somewhat equivocal.  She

15

testified that, during the second assault, the assailants were looking for money but had not yet

16

learned of the $700, but also acknowledged telling an investigator that Curry and Buford were

17

looking for the $700 when Curry pulled off L.R.'s clothes at the park.  (*See* Reporter's Transcript

18

on Appeal ("RT") at 422-423, 526.)  Boone further testified she was testifying truthfully and in

19

accordance with her statement to the investigator.  (RT at 470-473.)

20

Additional evidence admitted at trial, however, sufficiently showed petitioner's

21

intent to rob L.R. of the $700 when he and the others put her in the car.  While the evidence was

22

conflicting with respect to when his co-defendants learned of the $700, it was undisputed that

23

petitioner knew of the $700 before picking up L.R. the night of the assault.  Russell testified on

24

cross examination that, during the second assault, petitioner told Curry to "check" L.R., as in to

25

check her pockets.  (RT at 718-19.)  Curry similarly testified on cross-examination that petitioner

26

said to check L.R. for money during the second assault.  (RT at 823-24.)  Both Boone's and

Curry's statements to the investigator corroborated that petitioner had told the assailants to check

L.R. for money during the second assault.  (RT at 940-43.)  The investigator also testified during

the prosecution's rebuttal case that Boone had stated that, once in the car, petitioner said to L.R.,

"I thought you had $700."  (RT at 941.)  Viewing this evidence in the light most favorable to the

prosecution, the jury could easily have inferred that petitioner directed his cohorts to search L.R.

for the money, and when only $20 was found, that he decided to force L.R. to obtain the $700 for

him from her house.  The state appellate court's conclusion that the evidence sufficed to show

that petitioner intended to rob L.R. when she was placed in the car is not contrary to, or an

unreasonable application of, the *Jackson* standard.

Petitioner's additional argument that the evidence did not show that he intended to

rob L.R. of the $700 because she had promised to loan it to him is likewise without merit.  As the

court of appeal found, there was evidence from which the jury could infer that L.R. no longer

wished to loan the money to petitioner following the assault. (*See* RT at 285, 290).  Moreover,

the evidence discussed above showed that petitioner intended instead to take the money from her

by force or fear.

Regarding the elements of asportation, namely, more transportation than necessary

for the robbery and that the transportation increased the risk of harm to victim, the court of

appeal held:

> Buford also maintains that the prosecution failed to establish the
> asportation element of the crime.  He argues that the movement of
> L.R. from the park to the house was merely incidental to the
> robbery and did not substantially increase the risk of harm to her.
> Whether the forced movement of the victim was merely incidental
> to the target crime, and whether that movement substantially
> increased the risk of harm to the victim, "is difficult to capture in a
> simple verbal formulation that would apply to all cases." (People
> v. Dominguez (2006) 39 Cal.4th 1141, 1151 [47 Cal. Rptr. 3d 575,
> 140 P.3d 866].)  The Supreme Court suggests that the asportation
> element requires "a multifaceted, qualitative evaluation rather than
> a simple quantitative assessment.  Moreover, whether the victim's
> forced movement was merely incidental to the [target crime] is
> necessarily connected to whether it substantially increased the risk
> to the victim. 'These two aspects are not mutually exclusive, but

interrelated.'  (Rayford, [supra, 9 Cal.4th] at p. 12.)" (Id. at p. 1152.)

In support of his argument, Buford contends that the only way for defendants to get the $700 was to return to L.R.'s house, thus "the movement from the park to the house was 'merely incidental to the target crime' and did not substantially increase the risk of harm to [L.R.]" He suggests that they moved her from a location "where the likelihood of detection was near zero, to others, where it was more likely that she be observed and aided." Buford's analysis ignores the evidence and minimizes the interrelationship between the movement and the increased risk in the circumstances of this case. We disagree that the movement of L.R. from the park to the house was incidental to the target crime of robbery. Defendants drove to several locations before they went to L.R.'s home. Once inside the Malibu, defendants drove to obtain clean clothing for L.R., bought and smoked marijuana and Curry sped off not once but twice from L.R.'s home. And, even if detection was arguably more likely after defendants left the park with L.R., she was clearly not any safer. Defendants had placed L.R. in the backseat of the Malibu between Boone and Russell, with a self-proclaimed "drunk" driver, Curry, at the wheel. The pregnant L.R. was bruised, bleeding and unconscious when defendants placed her in the Malibu. Curry testified that in the car, Russell pointed a gun at L.R. and threatened to shoot her if she did not get the money. Further, the inference could be made that any delay in getting L.R. medical care substantially increased the risk of harm to her and her unborn child. On this record, a jury could reasonably find that defendants' forced movement of L.R. was more than incidental to the robbery and substantially increased her risk of harm.

*Curry*, 158 Cal.App.4th at 780-81.

Petitioner contends that the state court failed to explain how the additional locations to which petitioner and his co-defendants drove L.R. increased the risk of harm to L.R. and argues that the dangers presented by the BB gun and delayed medical care were already present at the park. These arguments are without merit. That the assailants did not drive directly to L.R.'s house showed that they transported her more than was merely incidental to the robbery, and there was evidence that Russell placed the on her lap in the car following the assaults. In contrast, there was no evidence that the gun was displayed previously at the park. (RT at 373-74; 428, 826-27). In addition, had the assailants left L.R. at the park, she could have sought out medical care to the extent her condition allowed. Once placed in the car between Boone and

15

1   Russell, L.R.'s care was left in the hands of petitioner and his co-defendants, who took no steps

2   to obtain medical care for her and later dumped her at the side of a field, half-dressed, staggering

3   and holding herself.  (RT at 434, 732, 838).  The state appellate court's conclusion that sufficient

4   evidence supported petitioner's conviction for aggravated kidnapping was not contrary to, or an

5   unreasonable application of the applicable *Jackson* standard.

6            B.       CALCRIM No. 1203 (Aggravated Kidnapping)

7            Petitioner next claims that the instruction provided by the trial court on aggravated

8   kidnapping, CALCRIM No. 1203, omitted an element of that offense, namely, that the defendant

9   must have the intent to rob at the time the victim is moved.

10           It is clearly established federal law that a criminal defendant is constitutionally

11  entitled to a determination of guilt beyond a reasonable doubt on all elements of the offense

12  charged, and a jury instruction that "fails to give effect to that requirement" violates due process.

13  *Middleton v. McNeil*, 541 U.S. 433, 437 (2004).

14                  Nonetheless, not every ambiguity, inconsistency, or deficiency in a
                    jury instruction rises to the level of a due process violation.  The
15                  question is whether the ailing instruction . . . so infected the entire
                    trial that the resulting conviction violates due process.  A single
16                  instruction to a jury may not be judged in artificial isolation, but
                    must be viewed in the context of the overall charge.  If the charge
17                  as a whole is ambiguous, the question is whether there is a
                    reasonable likelihood that the jury has applied the challenged
18                  instruction in a way that violates the Constitution.

19  *Id*. (internal citations and quotations omitted).  In addition, where a trial court fails to instruct the

20  jury on an element of the offense, the error is subject to harmlessness error review.  *Neder v.*

21  *United States*, 527 U.S. 1, 18 (1999).

22           In rejecting this claim on direct appeal, the state appellate court found that the

23  element of intent at the time of movement was implicitly conveyed to the jury by the instruction,

24  and that no error occurred:

25                  Russell [joined by Buford] contends that Judicial Council of
                    California Criminal Jury Instructions (2006) CALCRIM No. 1203
26                  (Kidnap for Robbery) improperly allowed the jury to convict her of

                                              16

1   aggravated kidnapping without finding that she had the intent to
    rob L.R. at the time the kidnapping commenced.  We conclude that
2   CALCRIM No. 1203 is a correct statement of the law.

3       The court instructed the jury on the elements of aggravated
        kidnapping as follows:
4
5       [T]he defendants are charged in Count Four with kidnapping for
        the purpose of robbery.  To prove that a defendant is guilty of this
        crime, the people must prove that, *one, the defendant intended to*
6       *commit robbery; two, acting with that intent, the defendant took,*
        *held or detained another person by force or instilling a reasonable*
7       *fear; and, three, using that force or fear, the defendant moved the*
        *other person or made the other person move a substantial*
8       *distance*; and, four, the other person was moved or made to move a
        distance beyond that merely incidental to the commission of the
9       robbery; and, five, the other person did not consent to the
        movement; and, six, the defendant did not actually and reasonably
10      believe, that the other person consented to the movement.

11      In order to consent, a person must act freely and voluntarily and
        know the nature of the act.  As used here, a substantial distance
12      means more than a slight or trivial distance.  The movement must
        have substantially increased the risk of harm to the person beyond
13      that necessarily present in the robbery.  In deciding whether the
        movement was sufficient, consider all of the circumstances relating
14      to the movement.  (Italics added.)

15      Although CALCRIM No. 1203 does not expressly state that the
        intent to rob must exist at the time the movement commences, we
16      conclude that the first three points of the instruction, set forth in
        italics, adequately express that requirement.  The instruction
17      describes the sequence of events starting with intent and followed
        by action – first to take, hold or detain the victim by force or fear,
18      and then to move the victim a substantial distance.  There was no
        error.
19
20  *Curry*, 158 Cal.App.4th at 781-82.

21          The state court's finding was not contrary to, nor an unreasonable

22  application of, the principles of federal law outlined above.  Rather, the court reasonably

23  construed the minor ambiguity in CALCRIM 1203 to conclude that the instruction implicitly

24  conveys that the intent to rob must exist at the time the movement commences.  There is no

25  reasonable likelihood that the jury applied the instruction in an unconstitutional manner.  For the

26  jury to have applied the instruction without finding that intent to rob exist at the time of the

                                        17

1  movement, it would have had to find that: (1) petitioner intended to rob L.R., (2) with intent to

2  hold her by force or fear, (3) then lost the intent to rob L.R. while still holding her by force or

3  fear, and (4) using that force or fear, moved L.R. a substantial distance.  Such findings are not

4  supported in the record and also defy common sense.  For the same reasons, even if the

5  instruction was in error, such error was harmless, because there is no indication it had a

6  substantial and injurious effect on the verdict.  Accordingly, the state court's conclusion that

7  CALCRIM No. 1203 did not improperly allow the jury to convict petitioner of aggravated

8  kidnapping without finding all the elements of that offense beyond a reasonable doubt was a

9  reasonable of clearly established applicable law.

10              C.      Voluntary Intoxication Instructions

11              Petitioner next claims that the trial court failed to instruct the jury on the law of

12  voluntary intoxication in order to determine whether he had the requisite intent to be convicted of

13  the following offenses: (1) attempted murder on a non-natural and probable consequences theory;

14  (2) robbery; (3) attempted robbery; and (4) aggravated kidnapping.

15              Again, a jury instruction may violate due process if it subverts the requirement

16  that a criminal defendant be convicted only upon proof beyond a reasonable doubt of every

17  element of the offenses charged violates due process.  *Middleton*, 541 U.S. at 437.

18              In rejecting petitioner's claim about voluntary intoxication instructions, the state

19  appellate court ruled:

20              First, we conclude that when read together (see People v. Smithey
               (1999) 20 Cal.4th 936, 963 [86 Cal. Rptr. 2d 243, 978 P.2d 1171]),
21              the instructions contained in CALCRIM Nos. 404 (Intoxication),
               625 (Voluntary Intoxication: Effects on Homicide Crimes) and
22              3426 (Voluntary Intoxication) provided adequate guidance to the
               jury.  CALCRIM No. 3426 specifically told the jurors that they
23              could consider defendant's voluntary intoxication "in deciding
               whether the defendant acted with the specific intent... [¶] [r]equired
24              for Counts One, Three, Four, Five and Six..."

25              Second, Buford was not prejudiced by any error in instructing the
               jury on voluntary intoxication because there is no evidence he was
26              intoxicated – or that he even drank alcohol – the night of the

                                          18

1

2

3

4

> incident.  Russell testified that she purchased three bottles of Mad
> Dog 20/20 at a liquor store in route to the park.  Buford bought a
> Sprite.  According to Russell, she and Boone shared one bottle,
> Curry drank a second, and all three of them shared the third bottle.
> This lack of evidence explains why Buford's attorney did not
> mention voluntary intoxication in his closing argument.

5   *Curry*, 158 Cal.App.4th at 790.

6          Once again, the state appellate court's analysis is not contrary to, or an

7   unreasonable application of, clearly established federal law, nor an unreasonable determination

8   of the facts in light of the evidence presented.  There was no evidence that petitioner was

9   intoxicated at any point during his participation in the crimes.  L.R. testified that Boone, Curry,

10  Russell, and petitioner drank alcohol at the park.  (RT at 360-61).  But the was no evidence that

11  petitioner drank enough to become intoxicated or that he behaved in a manner indicating

12  intoxication.  Other witnesses were equivocal about whether petitioner, in particular, drank any

13  alcohol at all, while Russell testified affirmatively that petitioner did not smoke marijuana with

14  the others.  (RT at 405-406, 586, 724.)  As petitioner did not present a defense of voluntary

15  intoxication and there was no evidence that he was intoxicated, the trial court did not err.  Even if

16  the minimal evidence of petitioner's drinking warranted more detailed instructions on voluntary

17  intoxication, petitioner was not harmed by the failure to so instruct because, as the state court

18  reasonably concluded, the evidence would not have caused the jury to conclude that he was

19  intoxicated.

20          D.      Unanimity Instruction (Robbery)

21          Petitioner next claims that the trial court erroneously failed to give a unanimity

22  instruction informing the jury that it must unanimously agree as to which act(s) constituted the

23  crime with respect to the robbery count.  The Court of Appeal rejected this claim, reasoning:

24  
> Buford argues that the court prejudicially erred in failing to instruct
> the jury on the requirement of unanimity with regard to the robbery
> charge in count three.  He notes that there was evidence of three
> acts of robbery – the forcible taking of L.R.'s shoes, cell phone and
> $20 – and argues that jurors could have disagreed about which act

25

26

or acts Buford committed.  The Attorney General argues that there was evidence of only two acts of robbery, one act being the taking of L.R.'s shoes and cell phone and the other act being the later taking of L.R.'s $ 20.  The Attorney General has the better argument.

The record reflects three items were taken from L.R.  The taking of two items, L.R.'s shoes and phone, occurred almost simultaneously during the first assault at the park and there is no evidence suggesting otherwise.  On these facts, the taking of L.R.'s shoes and cell phone were so closely connected that they formed a single incident of robbery and no unanimity instruction was required to distinguish between those takings.  (People v. Thompson (1995) 36 Cal.App.4th 843, 851 [42 Cal. Rptr. 2d 798] ["A unanimity instruction is not required where the offenses are so closely connected to form a single transaction or where the offense itself consists of a continuous course of conduct"].)

The third item taken from L.R. was her $20. Prior to the taking of her $20, Boone and Russell had ended the first assault and had driven away from the park.  L.R. asked Buford to call an ambulance; instead however, Buford called Boone and Russell back to the park to assault L.R. further.  While Boone and Russell were driving back to the park, Buford called again to tell them to bring a bat and flashlight from the car.  Defendants took the $20 during the second assault, when Boone and Russell returned to the park to "finish the job."  It appears from the record that the first robbery at the park was separated from the second robbery by a period of time, during which the beating of L.R. had abated and Buford was able to make two phone calls, the first to summon Boone and Russell back to the park to finish the job and the second to ask them to bring a bat and a flashlight.  Thus, the record demonstrates that L.R. was robbed at the park two separate times.

"[W]hen the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.]"  (People v. Russo (2001) 25 Cal.4th 1124, 1132 [108 Cal. Rptr. 2d 436, 25 P.3d 641].)   Where no election is made, the court has a duty to instruct sua sponte on the unanimity requirement.  (People v. Melhado (1998) 60 Cal.App.4th 1529, 1534 [70 Cal. Rptr. 2d 878].)

The failure to provide a unanimity instruction is subject to the Chapman harmless error analysis on appeal.  (People v. Wolfe (2003) 114 Cal.App.4th 177, 186 [7 Cal. Rptr. 3d 483] (Wolfe), citing People v. Deletto (1983) 147 Cal. App. 3d 458, 472 [195 Cal. Rptr. 233].)  Under that standard the question is "'whether it can be determined, beyond a reasonable doubt, that the jury actually rested its verdict on evidence establishing the requisite [elements of the crime] independently of the force of the …

misinstruction.'" (<u>Wolfe</u>, <u>supra</u>, 114 Cal.App.4th at p. 188.)

We conclude that the error in failing to instruct the jury on unanimity was harmless beyond a reasonable doubt. "Where the record provides no rational basis, by way of argument or evidence, for the jury to distinguish between the various acts, and the jury must have believed beyond a reasonable doubt that defendant committed all acts if he committed any, the failure to give a unanimity instruction is harmless. (<u>People v. Deletto</u>, <u>supra</u>, 147 Cal. App. 3d at p. 473.)  Where the record indicates the jury resolved the basic credibility dispute against the defendant and therefore would have convicted him of any of the various offenses shown by the evidence, the failure to give the unanimity instruction is harmless. [Citation.]"  (<u>People v. Thompson</u>, <u>supra</u>, 36 Cal.App.4th at p. 853.)

In this case, the prosecutor argued that Buford was an aider and abettor in the taking of L.R.'s shoes, cell phone and money at the park.  Buford maintained that there was no evidence that he took anything from L.R. although he was there.  He suggested that the only evidence that he aided and abetted the crime came from Curry, whose testimony the jury should not believe.  Buford also argued that he had no motive to rob L.R. because she had agreed to give him the $700.  Defense counsel argued that his client did nothing in regard to the money and suggested that, "it was... the women in the back seat that were interested in that money and were making the claims and making the requests..."  The verdicts demonstrate that the jury rejected Buford's defense.

The evidence is overwhelming that Buford masterminded all of the crimes against L.R., including the robberies.  It also shows that he was an aider and abettor in all of the crimes including the two separate robberies at the park.  Circumstantial evidence suggests that Buford encouraged Curry to take the cell phone during the first assault to prevent L.R. from calling for help.  Evidence that the cell phone ended up in the hands of Buford's cousin supports the inference that even if Curry took the cell phone in the first instance, Curry gave the cell phone to Buford.  Evidence of Buford's role as an aider and abettor is even stronger as to the $20 taken from L.R. in the second assault, where he repeatedly asked L.R. for the money and told Curry to "check [L.R.] for money."  Buford, however, did not argue or present any evidence from which the jury could distinguish between the acts of robbery at the park; he offered the same defense to both acts of robbery – that he took nothing from L.R. and had no motive to do so – yet the evidence of his involvement in the second act of robbery was conclusive. Given this record, it is reasonable to conclude that the jury believed beyond a reasonable doubt that Buford committed all acts if he committed any.  Thus, the failure to give the unanimity instruction was harmless beyond a reasonable doubt.  (See <u>Wolfe</u>, <u>supra</u>, 114 Cal.App.4th at p. 188; <u>People v. Gary</u> (1987) 189 Cal. App. 3d

1            1212, 1218–1219 [235 Cal. Rptr. 30].)

2   *Curry*, 158 Cal.App.4th at 782-84.

3            Respondent asserts that no clearly established federal law requires the giving of a

4   unanimity instruction.  This issue need not be decided here.  Even assuming, for purposes of this

5   opinion, that a unanimity instruction was constitutionally required in this case, the state court's

6   conclusion that the trial court's omission in this regard was harmless beyond a reasonable doubt

7   was a reasonable application of the applicable federal law.  Even if all three takings were

8   considered separate events, as petitioner urges, the state appellate court correctly observed that

9   the jury clearly rejected the only defense offered by petitioner: that it was the two women who

10  were solely responsible for the robberies.  There was substantial evidence that petitioner aided

11  and abetted at least one, if not all three, of the robberies.  Moreover, any error was harmless.

12  Petitioner would not have escaped conviction on the robbery count had a unanimity instruction

13  been provided, of this there is no grave doubt.  *Cf. O'Neal v. McAninch*, 513 U.S. 432, 445

14  (1995) (holding that, under Brecht, when a federal habeas court is in grave doubt about an error's

15  harmlessness, it should grant relief).

16            E.      Aider and Abettor Liability Instructions (Attempted Murder of a Fetus)

17            Petitioner next argues that the trial court erroneously failed to instruct the jury

18  that, in order to find him guilty of attempted murder of a fetus under the natural and probable

19  consequences doctrine as an aider and abettor, it must find that he personally premeditated the

20  murder.  According to petitioner, by failing to instruct the jury in that manner, the trial court

21  deprived him of due process.

22            As an initial matter, petitioner's argument hinges on whether personal

23  premeditation by an aider and abettor is an element of attempted premeditated murder under

24  California Penal Code §664(a).  California law on this issue is not clear.  *Compare People v.*

25  *Anderson*, 47 Cal.4th 92 (2009) and *People v. Seel*, 34 Cal.4th 535 (2004) (holding that

26  premeditation is an element of attempted premeditated murder under §664(a) rather than a

22

penalty provision for purposes of double jeopardy) with *People v. Lee*, 31 Cal.4th 613 (2003) (holding that personal premeditation is not an element of attempted premeditated murder under the language of §664(a), which requires only that the murder be premeditated, not that the particular murderer have joined in the premeditation).  In this case, however, the state court concluded it was unnecessary to address the application of the foregoing authorities, because "[e]ven if the court erred in not instructing the jury on premeditation in the circumstances of this case, the error was harmless beyond a reasonable doubt." *Curry*, 158 Cal.App.4th at 792.  The state court's finding of no prejudice was reasonable.

The state court of appeal noted that, in convicting Russell of conspiracy to commit murder, the jury necessarily found that she premeditated and deliberated the murder. *Curry*, 158 Cal.App.4th at 792.  The same is true for petitioner.  In instructing the jury on conspiracy, the trial court required it to find that petitioner intended to agree and did agree with another to commit murder and, at the time of the agreement, intended that he or another conspirator would commit murder.  (RT at 1236.) These elements of conspiracy require a state of mind indistinguishable from premeditation and deliberation. *People v. Cortez*, 18 Cal.4th 1223, 1232 (1998).  Moreover, there was ample evidence that petitioner masterminded the assaults against L.R. with the intent to kill her unborn baby.  (*See e.g.*, RT at 39--91 (petitioner devised the plan to tell L.R. he was taking her to the movies but instead travel to the park where Boone would assault her); RT at 408 (Boone began attacking L.R. when petitioner gave the signal); RT at 414-15 (after the first assault, petitioner asked Boone and Russell to return to continue assaulting L.R. until "that baby gets up out of her" and to bring the bat and flashlight from the car).)  There is no grave doubt that if asked to, the jury would have found that petitioner engaged in the required premeditation for conviction.

F.     Upper Term Selection at Sentencing

Petitioner next argues that the trial court violated his Sixth Amendment right to trial by jury when it imposed the upper term on his robbery conviction based on aggravating

factors found by the court and not determined by the jury beyond a reasonable doubt.  The state

court of appeal rejected this claim after concluding that, while the trial court did commit Sixth

Amendment error, the error was harmless.

It appears that the trial court indeed made an error of constitutional magnitude

when it imposed the upper term based on its findings that petitioner's victim was particularly

vulnerable and that petitioner betrayed a position of trust.  Such findings, when used to impose

an upper term under California law at the time of petitioner's sentencing, must be determined by

the jury beyond a reasonable doubt.  *Cunningham v. California*, 549 U.S. 270 (2007).[2]

In concluding that the error was harmless, the Court of Appeal reasoned:

> Denial of the right to jury trial on aggravating circumstances is
> reviewed under the harmless error standard set forth in Chapman,
> supra, 386 U.S. 18 [17 L. Ed. 2d 705]. (Sandoval, supra, 41 Cal.4th
> at pp. 838–839, citing Washington v. Recuenco (2006) 548 U.S.
> 212 [165 L. Ed. 2d 466, 476, 126 S. Ct. 2546], and Neder v. United
> States (1999) 527 U.S. 1, 8–15 [144 L. Ed. 2d 35, 119 S. Ct.
> 1827].)  Under this standard, "we must determine whether, if the
> question of the existence of an aggravating circumstance or
> circumstances had been submitted to the jury, the jury's verdict
> would have authorized the upper term sentence."  (Sandoval, supra,
> 41 Cal.4th at p. 838.)  If we conclude, "beyond a reasonable doubt,
> that the jury, applying the beyond-a-reasonable-doubt standard,
> unquestionably would have found true at least a single aggravating
> circumstance had it been submitted to the jury, the Sixth
> Amendment error properly may be found harmless."  (Id. at p. 839,
> italics added.)   The record in this case supports such a finding as
> to both Buford and Curry.

> As set forth in detail in the statement of facts, Buford and L.R. had
> dated for several months and Buford was the father of L.R.'s
> unborn child.  L.R. was seven months pregnant at the time Buford
> gathered his friends to rob and beat her with the intent to cause a
> miscarriage.  It is difficult to imagine a greater breach of trust
> against a more vulnerable victim.  (Cal. Rules of Court, rule
> 4.421(a)(3), (4).)

> ...

---

[2] *Cunningham* rested on the fact that, as California law existed at that time, a sentence to
the middle term was presumed absent special findings.  549 U.S. at 277-78.  The California
legislature amended the law in response to *Cunningham*.  Nevertheless, this case concerns the
law as it existed in *Cunningham*, not the amended law on the rule announced in that case.

> Based on this record, we conclude a jury would have found the
> cited aggravating circumstances true beyond a reasonable doubt
> had they been given the opportunity.  Accordingly, any
> <u>Apprendi/Blakely/Cunningham</u> error was harmless.

*Curry*, 158 Cal.App.4th at 794.  Both the analysis and conclusion of the state court are consistent

with, and reasonable applications of, Supreme Court precedent.  The Sixth Amendment violation

alleged by petitioner is indeed subject to harmless error review.  *Washington v. Recuenco*, 548

U.S. 212, 222 (2006).  The state court's application of harmless error review was a reasonable

application of the federal standard in light of the record evidence.

Under California law, only one aggravating factor is necessary to set the upper

term as the maximum term.  *See* Cal. R. Ct. 4.420; *People v. Cruz*, 38 Cal.App.4th 427, 433 (2nd

Dist. 1995); *People v. Forster*, 29 Cal.App.4th 1746, 1758 (4th Dist. 1994).  Any *Blakely* error

therefore will be found harmless if it is not prejudicial as to just one of the aggravating factors at

issue.  *Butler v. Curry*, 538 F.3d at 648.

As the state court concluded, evidence established that L.R., at seven months

pregnant, that she and her unborn child were particularly vulnerable, and that petitioner abused

the position of trust he enjoyed with L.R. to induce her to accompany him to the park.  *See Butler

v. Curry*, 528 F.3d 624, 649 (9th Cir. 2008) (noting that California law defines "vulnerable" as

"defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the

defendant's criminal act" (internal quotations and citations omitted)).  A victim who is

vulnerable to a "special or unusual degree, to an extent greater than in other cases," is

"particularly" vulnerable.  *Id*.  In other words, 'particularly vulnerable' victims have inherent

personal characteristics that, sometimes in combination with the manner in which the crime was

committed, render them more vulnerable than other victims."  *Id*.  Certainly, it is a reasonable

conclusion that the jury, given the opportunity, would have found either that L.R. was

particularly vulnerable, or that petitioner abused the position of trust he enjoyed with L.R., or

both of these factors, beyond a reasonable doubt.

G.     Attempt to "Join" in Co-Defendants' Claims

Petitioner indicates that he wishes to "join" in any claims raised in habeas corpus petitions filed by his co-defendants.  The court is aware only of the petition of Titenesha Russell, Case No. 2:08cv1538.  Russell raises no claims in that case not already addressed herein.  In any event, it is petitioner's burden, not that of his co-defendants, to show petitioner is in custody in violation of the Constitution.  *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002).  Allegations of fact are required.  *Brown v. Allen*, 344 U.S. 443, 458, n.6 (1953) (overruled on other grounds in *Townsend v. Sain*, 372 U.S. 293 (1963)); *see also James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").  Petitioner fails to meet his burden with allegations that he wishes to "join" in claims presented by his co-defendants in any habeas corpus petitions filed on their own behalf.

H.     Ineffective Assistance of Trial Counsel

Petitioner next claims that his trial counsel was ineffective for not attempting to impeach Boone's testimony at trial by eliciting that she used "psychotic medication" regularly and that she had previously lost an unborn child after being assaulted by friends.  Petitioner alleges that he provided this information to counsel.  This claim was rejected without comment by the California Supreme Court in denying petitioner's state habeas petition.  This court must therefore independently review the record to determine whether denial of that claim warrants relief under 28 U.S.C. § 2254(d).

It is clearly established federal law that the Sixth Amendment right to counsel is violated by counsel's ineffective assistance where:

> (1) counsel's performance was deficient; i.e., it fell below an objective standard of reasonable competence; and

> (2) the defendant suffered prejudice from counsel's deficient performance; i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a

1    probability sufficient to undermine confidence in the outcome."

2  *Strickland v. Washington*, 466 U.S. 668, 687-96 (1984).

3        Upon careful review of the record, it does not appear that counsel's failure to

4  impeach Boone in the manner suggested by petitioner either was deficient, or that it prejudiced

5  petitioner.  Petitioner does not explain how Boone's alleged use of medication or past assault

6  could have caused the jury to discredit her testimony.  To the contrary, the jury could easily have

7  regarded Boone's experience being similarly victimized as bolstering the reliability of her

8  testimony.  It should be presumed that counsel's decision not to elicit this fact in particular fell

9  within "the wide range of reasonable professional assistance."  *Id*. at 689.  Moreover, even if the

10  jury had discounted Boone's testimony for the reasons advanced by petitioner, there was other

11  substantial evidence against him in the form of the testimony of L.R., which was corroborated by

12  numerous other witnesses (her brother, her grandmother, the DA's investigator, and those who

13  assisted L.R. after the attack).  There is no reasonable probability that petitioner would have

14  secured a better outcome if only his lawyer had elicited that Boone regularly used "psychotic

15  medication" and that she had lost an unborn baby in an assault.  It is noted that Russell's attorney

16  did elicit that Boone was on anti-depressant medication, nevertheless, this fact apparently did not

17  cause the jury to discredit her testimony.  (RT at 460.)  Petitioner is not entitled to relief for trial

18  counsel's alleged deficiency in this regard.

19        I.      Restitution Order

20        For his final claim, petitioner contends that the trial court violated his due process

21  rights by imposing a maximum restitution fine of $10,000 under California Penal Code

22  §1202.4(b) without considering his ability to pay.  The California Supreme Court rejected this

23  claim without comment in petitioner's state habeas corpus action.

24        This claim is not cognizable on federal habeas because it does not challenge

25  petitioner's custody as required by 28 U.S.C. § 2254(a).  Federal habeas corpus relief is expressly

26  limited to claims based "only on the ground that [the petitioner] is *in custody* in violation of the

1   Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a) (emphasis added).

2   Petitioner's challenge to the restitution order does not involve the state's custody of him and is

3   therefore not reviewable by this court. *Flores v. Hickman*, 533 F. Supp. 2d 1068, 1085 (C.D.

4   Cal. 2008); *see also United States v. Thiele*, 314 F.3d 399, 401-02 (9th Cir. 2002) (interpreting

5   custody requirement of 28 U.S.C. §2255 to exclude claims for relief from a restitution order);

6   *United States v. Kramer*, 195 F.3d 1129, 1130 (9th Cir. 1999) (same).

7   VI.  CONCLUSION

8   For all these reasons, IT IS HEREBY RECOMMENDED that petitioner's

9   application for a writ of habeas corpus be DENIED.

10   These findings and recommendations are submitted to the United States District

11   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within

12   twenty-one days after being served with these findings and recommendations, any party may file

13   written objections with the court and serve a copy on all parties.  Such a document should be

14   captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the

15   objections shall be served and filed within fourteen days after service of the objections.  The

16   parties are advised that failure to file objections within the specified time may waive the right to

17   appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

18   DATED: December 1, 2010

19   *Charlene H. Sorrentino*

20   CHARLENE H. SORRENTINO
     UNITED STATES MAGISTRATE JUDGE

21

22

23

24

25

26